1  Marc Y. Lazo SBN: 215998
WILSON KEADJIAN BROWNDORF, LLP
2  1900 Main Street, Suite 600
Irvine, California 92614
3  Phone No.: (949) 690-5557
Fax No.: (949) 234-6254
4  *Attorneys for Plaintiff*

5

6  # UNITED STATES DISTRICT COURT

7  # SOUTHERN DISTRICT OF CALIFORNIA

8

9  )  Case No.: TBD   **'18CV1896 AJB NLS**
)  Assigned For All Purposes
10  Thomas Land & Development, LLC,  )  To Hon. [_____]
)
11  Plaintiff,  )
v.  )
12  )  **UNLIMITED CIVIL ACTION**
VRATSINAS CONSTRUCTION  )
13  COMPANY, an Arkansas  )  **COMPLAINT FOR:**
corporation; VCC, LLC, a Delaware  )  **(1) RACKETEER INFLUENCED AND**
14  Limited Liability Company; VCC  )  **CORRUPT ORGANIZATIONS ACT; COUNT**
GLOBAL, LLC, a Delaware Limited  )  **I – VIOLATION OF 18 U.S.C. § 1962(c);**
15  Liability Company; VCC  )  **(2) RACKETEER AND CORRUPT**
CONSTRUCTION COMPANY, a  )  **ORGANIZATIONS ACT; COUNT II –**
16  Delaware Foreign Corporation; VCC  )  **VIOLATION OF 18 U.S.C. § 1962(d);**
CONSTRUCTION CORPORATION,  )  **(3) SHERMAN ANTITRUST ACT;**
17  a California Corporation; VCC  )  **VIOLATION OF 15 U.S.C. § 1.**
HOLDCO INC., a Delaware  )  **(4) PROFESSIONAL NEGLIGENCE**
18  Corporation; VCC FUND, LLC, a  )  **(5) NEGLIGENCE**
Delaware Limited Liability Company;  )  **(6) INTENTIONAL MISREPRESENTATION**
19  VCC GROUP LLC, a Delaware  )
Limited Liability Company;  )
20  DIVERSIFIED CONSTRUCTION  )
MATERIALS AND SERVICES,  )  DEMAND FOR JURY TRIAL
21  LLC; a Nevada Limited Liability  )
Company; SAM ALLEY, an  )
22  individual; DONALD DAVIS, an  )
individual; JASON KEENEY, an  )
23  individual; RYAN MCCLENDON; an  )
)

-1-

individual; and DOES 1-100, )
inclusive, )
)
Defendants. )
_____ )

# **COMPLAINT**

Plaintiff Thomas Land & Development, LLC ("Plaintiff" or "Thomas")[1] files this complaint against Defendants: Vratsinas Construction Company, and its owners and officers; VCC, LLC, and its owners and officers; VCC Global, LLC, and its owners and officers; VCC Construction Company, and its owners and officers; VCC Construction Corporation, and its owners and officers; VCC Holdco, Inc., and its owners and officers; VCC Group, LLC, and its owners and officers (collectively "VCC")[2]; Diversified Construction Materials and Services, LLC ("DIVERSIFIED"), and its owners and officers (VCC and DIVERSIFIED hereinafter collectively referred to as "ENTITY DEFENDANTS"); Sam Alley ("ALLEY"); Donald Davis ("DAVIS"); Jason Keeney ("KEENEY"); Ryan McClendon ("MCCLENDON") (ALLEY, DAVIS, KEENEY, and MCCLENDON hereinafter referred to as "INDIVIDUAL DEFENDANTS"); and

---

[1] Plaintiff is the duly authorized Assignee of any and all existing and potential claims, demands, causes of action, lawsuits, rights of action, expenses, legal fees, and/or damages, of any kind or classification, whether in law, equity or otherwise, alleged herein against the collective named and DOE DEFENDANTS and arising out of the projects identified herein, and all other projects in which any of said DEFENDANTS were involved.

[2] Plaintiff is informed and believes that the following additional inactive VCC controlled entities were also involved in the wrongdoing alleged hereafter, but have not been named as DEFENDANTS because of their dissolution: VCC Holdings, Inc.; VCC Acquisition Co.; and VCC Investments.

Does 1-100 (collectively "DEFENDANTS")[3] based upon knowledge, relevant documents and information and belief, alleging as follows:

## NATURE OF THIS ACTION

1. This is an action seeking damages and other relief against DEFENDANTS for the wrongful and collusive business practices perpetrated through mail fraud, extortion and an anti-competitive conduct in violation of the Federal laws discussed below.

2. The named Plaintiffs bring this action under the Racketeer Influenced and Corrupt Organizations Act 18 U.S.C. §1962 et seq. and the Sherman Antitrust Act 15 U.S.C. § 1, among other common law claims, on behalf of themselves and for all other similarly situated entities who submitted bids as subcontractors, materialmen or vendors on private projects that were developed, constructed, managed or otherwise controlled by DEFENDANTS, including but not limited to:

      a.    The Rim Shopping Center in San Antonio, TX

      b.    The Forum on Peachtree Parkway in Peachtree Corners, GA

      c.    The Forum Carlsbad in Carlsbad, CA

      d.    Westside Centre in Huntsville, AL

3. As a consequence of DEFENDANTS' unlawful conduct described herein, Plaintiff has been prevented from lawfully obtaining work due to anti-competitive

---

[3] The nature and extent of the involvement of former and current "owners and officers" of the various VCC entities identified above, other than ALLEY and DAVIS, in the various criminal and tortious conduct described herein, remains under investigation. Plaintiff will seek leave of court to add these principals to DEFENDANTS upon ascertainment of their individual involvement and participation.

1  business practices and have directly suffered damages due to fraud and Defendant's

2  illegal conduct.

3      4.    As a proximate and direct cause of DEFENDANTS' aforementioned

4  wrongful conduct, Plaintiff has been damaged in an amount to be proven at trial.

5                                    **PARTIES**

6  **A. PLAINTIFF**

7      5.    At all times mentioned herein, Plaintiff Thomas Land & Development,

8  LLC was and is operating as a corporation with its principal place of business in

9  Georgia.

10 **B. DEFENDANTS**

11     6.    Plaintiff is informed and believes that defendant VRATSINAS

12 CONSTRUCTION COMPANY is an Arkansas corporation with headquarters at 216

13 Louisiana Street, Little Rock, Arkansas 72203. VRATSINAS CONSTRUCTION

14 COMPANY operates as a full-service construction contractor that offers a variety of

15 services including but not limited to pre-construction services, bidding oversight

16 processes, construction and quality management, and general contracting services

17 throughout the United States.  Plaintiff is further informed and believes and thereon

18 alleges that defendant VRATSINAS CONSTRUCTION COMPANY has offices

19 throughout the state of California, particularly Irvine, California, and regularly conducts

20 business in the state of California. Upon information and belief, VRATSINAS

21 CONSTRUCTION COMPANY has and continues to employ anti-competitive business

22 practices and has defrauded the Plaintiff over countless federally-funded projects and

23 public works contracts, including through the commission of wire and mail fraud, in

1  order to further its numerous illegal schemes by and through the remaining

2  DEFENDANTS, as further alleged below.

3       7.     Plaintiff is informed and believes that the following business entities are

4  shells of VRATSINAS CONSTRUCTION COMPANY: VCC, LLC; VCC GLOBAL,

5  LLC;   VCC    CONSTRUCTION    COMPANY;    VCC    CONSTRUCTION

6  CORPORATION; VCC HOLDCO INC.; VCC FUND, LLC; and VCC GROUP LLC.

7  Upon information and belief, these shell companies played an active role in the illegal

8  schemes alleged below and were established to avoid liability and divert assets, qualify

9  for federally-funded projects and public works contracts under false pretenses, and

10 otherwise further the criminal and tortious conduct set forth below, to the detriment of

11 Plaintiff.

12      8.     Plaintiff is informed and believes that defendant DIVERSIFIED was

13 formed under the laws of the state of Nevada and purports to be in the business of

14 wholesale door supply and distribution of lumber, plywood, and millwork.

15 DIVERSIFIED was actively involved in and formed for the purposes of furthering the

16 schemes and activities alleged below that caused damages to Plaintiff.

17      9.     Plaintiff is informed and believes that Defendant ALLEY is an individual

18 primarily residing in the state of Arkansas. ALLEY is one of the founders, chairman,

19 and CEO of VCC.

20      10.    Plaintiff is informed and believes that Defendant DAVIS is an individual

21 residing in the state of California. DAVIS is the Senior Vice President of VCC where

22 he handles contracting and pricing solicitations and was responsible for directly

23 overseeing and orchestrating many of the criminal and tortious activities alleged herein.

His primary responsibilities have included overseeing the formation and execution of subcontractor and supplier contracts, which have served as a fundamental basis for the perpetration of the conduct set forth below.

11.    Plaintiff is informed and believes that Defendant KEENEY is an individual primarily residing in the state of Texas and a Vice President of VCC.

12.    Plaintiff is informed and believes that Defendant MCCLENDON is an individual primarily residing in the state of Texas and President of VCC.

**C. ALTER EGO SHAM ENTITIES**

13.    Plaintiff is informed and believes and thereon alleges that some of the entities named as DEFENDANTS herein, including but not limited to VCC, DIVERSIFIED, and DOES 1 through 100 (hereinafter occasionally collectively referred to as the "ALTER EGO DEFENDANTS"), and each of them, were at all times relevant the alter egos of each other by reason of the following:

a.    Plaintiff is informed and believes and thereon alleges that the ALTER EGO DEFENDANTS, at all times herein mentioned, dominated, influenced, and controlled each other and the officers of one another, as well as the business, property, and affairs of each other.

b.    Plaintiff is informed and believes and thereon alleges that, at all times herein mentioned, there existed and now exists a unity of interest and ownership between the ALTER EGO DEFENDANTS, such that the individuality and separateness of each of the ALTER EGO DEFENDANTS have ceased.

c.    Plaintiff is informed and believes and thereon alleges that, at all times since the formation of each, the ALTER EGO DEFENDANTS have used each other as conduits for the conduct of their personal business, property, and affairs.

d.    Plaintiff is informed and believes and thereon alleges that, at all times herein mentioned, each of the ALTER EGO DEFENDANTS was created and continued pursuant to a fraudulent plan, scheme, and device, whereby the income, revenue, and profits of each of the ALTER EGO DEFENDANTS were diverted and distributed between themselves.

e.    Plaintiff is informed and believes and thereon alleges that, at all times herein mentioned, each of the ALTER EGO DEFENDANTS was organized as a device to avoid individual liability and for the purpose of substituting financially irresponsible entities in the place and stead of themselves, and accordingly, the ALTER EGO DEFENDANTS were formed with capitalization totally inadequate for the business in which said entities were engaged.

f.    By virtue of the foregoing, adherence to the fiction of the separate existence of each of the ALTER EGO DEFENDANTS would, under the circumstances, sanction a fraud and promote injustice in that Plaintiff would be unable to realize upon any judgment in its favor.

14.    Plaintiff is informed and believes and thereon alleges that, at all times relevant hereto, the ALTER EGO DEFENDANTS acted for each other in connection with the conduct hereinafter alleged and that each of them performed the acts

COMPLAINT

1  complained of herein or breached the duties herein complained of as agents of each

2  other, and each is therefore fully liable for the acts of the other.

3  **D. DOE DEFENDANTS**

4       15.    The true names and capacities, whether individual, corporate, associate, or

5  otherwise, of defendants named herein as Does 1 through 100, inclusive, are currently

6  unknown to Plaintiff, who therefore sues said defendants by such fictitious names.

7  Plaintiff is informed and believes, and thereon alleges that each of these fictitiously

8  named defendants is in some manner responsible for the events and damages alleged

9  herein and will seek leave of court to amend this Complaint to show the true names and

10  capacities when the same have been ascertained.[4]

11                         **JURISDICTION**

12       16.    Plaintiff brings this complaint under federal diversity jurisdiction, 28

13  U.S.C. § 1332, as the parties are completely diverse in citizenship and the amount in

14  controversy exceeds $75,000.  This action also arises under the laws of the United

15  States, in particular, the Racketeer Influenced and Corrupt Organizations Act ("RICO"),

16  18 U.S.C. § 1961 *et seq.* and the Sherman Antitrust Act, 15 U.S.C. § 1 *et seq.*

17  Accordingly, this Court has federal subject matter jurisdiction over the subject matter

18  of this action pursuant to 28 U.S.C. § 1331, 18 U.S.C. 1964, 18 U.S.C. § 1961 *et seq.*

19  and 15 U.S.C. § 1314 *et seq.*

20

21                                              
[4] Plaintiff is informed and believes that there were additional sham entities controlled

22  by ALLEY that acted as suppliers and materialmen in furtherance of each of DEFENDANTS' schemes alleged herein. Said entities have been referred to as "ADVANTAGE" and "GOLDEN," and this Complaint will be amended to identify

23  their full name and affiliation as soon as the same are ascertained.

17.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 *et seq.* and 18 U.S.C. § 1965(a) because a substantial part of the events giving rise to this action occurred in this district and because the associative enterprise perpetrated by DEFENDANTS transacts business in this district.

## DEFENDANTS' VARIOUS SCHEMES PERPETRATED THROUGH NUMEROUS LARGE-SCALE PRIVATE PROJECTS

### A. DEFENDANTS' SHAM SUBCONTRACTOR AND BID MANIPULATION SCHEMES

18.     Plaintiff is informed and believes that ENTITY DEFENDANTS knowingly conceived of their SHAM SUBCONTRACTOR SCHEME in order to ensure that contract awards and the various private projects would directly inure to the benefit of VCC.  At times, VCC would also conspire with preselected subcontractors ("POCKET SUBCONTRACTORS"), including but not limited to: ACC DEMO, INC.; BREGELECTRIC CORP.; G.D. HEIL, INC.; LARGO CONCRETE, INC.; SAM RAMMAHA PAINTING COMPANY, INC.; JOHN JORY CORP.; TAFT ELECTRIC COMPANY; and SOUTHERN CALIFORNIA GRADING INC., among others, to effectuate this and others of DEFENDANTS' later described schemes. As part of this scheme, when selecting subcontractor bids for projects, VCC would engage in bid rigging[5] by actively concealing the lowest legitimate bid from the owner and instead

---

[5] "Bid rigging" is defined by the United States Department of Justice as conduct "involv[ing] an agreement or arrangement among companies to determine the successful bidder in advance of a bid letting at a price set by the successful bidder." U.S. Dep't. of Justice, Antitrust Resource Manual (Nov. 2017), https://www.justice.gov/usam/antitrust-resource-manual-2-antitrust-division-field-offices.

nominally engaging a sham subcontractor, such as DIVERSIFIED, at an inflated price, which VCC feigned as being a wholly distinct and separately owned entity. VCC commissioned the formation of these sham entities, often as MBEs, which performed no work whatsoever on a project, and would charge the project owner the inflated price, while retaining the legitimately lowest bidding subcontractor – or at times, a POCKET SUBCONTRACTOR – to perform the actual work, and pocket the difference. In doing so, ENTITY DEFENDANTS engaged in classic self-dealing, bid rigging, and price fixing, which created an anti-competitive and deceptive bidding process in violation of 15 U.S.C. § 45(a)(1), as they were effectually awarding themselves these contracts. 40. In particular, Plaintiff is informed and believes that Defendant KEENEY was involved in orchestrating all of the payments, transferring the bids, and perpetrating the fraud against the Plaintiff throughout this scheme.

19.   In order to conceal this scheme from Plaintiff, VCC presented Plaintiff with a "Bid Recap Sheet," which was nothing more than a doctored spreadsheet that ENTITY DEFENDANTS purported to accurately reflect the bidding process for a particular project. Fraudulent items on these Bid Recap Sheets included, without limitation:

    a.   Concealing the lowest bidding subcontractor for particular trades;

    b.   Displaying a sham entity as the "winning" subcontractor; and

    c.   Adding upwards of twenty percent (20%) across the board as to all "winning" bids.

20.   VCC also regularly presented and awarded bids to sham entities like DIVERSIFIED for project management, general contracting, and various subcontractor

trade services in a manner designed to dupe the project owner into believing the work was being performed at the lowest rate possible.  This scheme was particularly fruitful through the implementation of VCC's sham entities, the general existence of which is much more limited, enabling VCC to inflate its sham bids even higher while feigning to the project owner that legitimate MBEs were being retained for the trade work at the lowest possible price.  Upon further information and belief, in order to pass the sham entities' bids off as legitimate, VCC would extract and (without permission) copy the scope of work language from the lowest bidding subcontractor onto their sham subcontractor letterhead and simply increase the numbers to create a higher bid price.  The sham entities (through VCC employees) would doctor fraudulent invoices, which were passed on, typically through United States Mail, for payment by the project owners, who were completely unaware of the existence of the legitimate subcontractor (or POCKET SUBCONTRACTOR) that actually performed the work.   Upon completion, VCC would receive payment of the grossly inflated rate from the project owner, pay the lower rate to the subcontractor, and retain the difference as profit through this fraudulent scheme.

21.    Upon further information and belief, multiple of VCC's POCKET SUBCONTRACTORS were "in" on this scheme and were happy to actively participate in order to be awarded the work.

22.    By way of example, Plaintiff is informed and believes that VCC would invariably hire its own sham subcontractor, DIVERSIFIED, on every project calling for Doors and Hardware installation, such that other subcontractors in this trade were chilled from even bidding on VCC projects, because they knew DIVERSIFIED would

invariably be awarded.  If another subcontractor in this trade submitted a lower bid, VCC would simply conceal the bid from the project owner, cause the award to be issued to DIVERSIFIED, and hire a lower-bidding subcontractor to perform the actual work. Again, VCC's tactics in this regard became so customary that other legitimate subcontractors in this trade stopped bidding for the job altogether. The fact that DIVERSIFIED maintained a physical office at VCC's headquarters in Little Rock facilitated this scheme.

## B. DEFENDANTS' POCKET SUBCONTRACTOR KICKBACK SCHEME

23.    The term "kickback" is defined by the Supreme Court in *Skilling v. United States*, 130 S.Ct. 2896, 2933-34 (2010) as "any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided, directly or indirectly, to persons for the purpose of improperly obtaining or rewarding favorable treatment in connection with specific circumstances."

24.    Plaintiff is informed and believes that in addition to setting up sham entities such as DIVERSIFIED, VCC would knowingly preselect certain POCKET SUBCONTRACTORS who were invariably awarded project contracts and would receive kickbacks in exchange for their participation in DEFENDANTS' schemes. At times, VCC would knowingly hire unlicensed POCKET SUBCONTRACTORS because they were cheaper and would be more likely to acquiesce to VCC's demands. In particular, VCC had at least each of the following trades performed by POCKET SUBCONTRACTORS: poured concrete foundation and structure contractors, structural steel and precast concrete contractors, framing contractors, masonry contractors, roofing contractors, and electrical contractors, among others.

25.     Throughout the aforementioned projects, VCC submitted and directed these POCKET SUBCONTRACTORS to deliver via United States mail fraudulent, duplicative, and inflated invoices to the project owner for payment, in furtherance of the fraudulent POCKET SUBCONTRACTOR KICKBACK SCHEME and for the purpose of realizing additional profit from each such contractor's scope of work. Specifically, VCC would knowingly submit and ask each POCKET SUBCONTRACTOR to deliver two invoices, one for "labor" and the other for "materials," the latter of which was a purely doctored duplicative charge. In fact, the "labor" invoice total subsumed both labor and material costs, which comprised the entirety of the particular POCKET SUBCONTRACTOR's actual cost of work. Unbeknownst to the project owner, VCC would submit a duplicative second invoice for "materials" that was never purchased or used for the Project, which invoice was entirely fraudulent.  VCC would also knowingly manipulate and doctor bid books to feign the appearance that certain invoices and charges were initially agreed to by the project owner, when in actuality the original document contained different (i.e., lesser) agreed upon numbers.

26.     In fact, upon information and belief, VCC instructed its employees to tear out pages of project bid books, manipulate bid numbers by redacting the original pages, make photocopies of the doctored pages, and substitute them into the books for the original pages in order to misrepresent the terms of the initial deal to the project owners. Such fraud also helped prevent detection of the misrepresentations and concealments contained in the Bid Recap Sheets.

27.     Upon information and belief, the POCKET SUBCONTRACTORS would knowingly participate in these schemes, amongst others, with the intent of defrauding the project owner and inducing gross overpayments in order to realize the fraudulently induced profits.

28.     In order to obtain full payment for these fraudulent invoices, VCC would knowingly establish fictitious business entities and name them after various POCKET SUBCONTRACTORS and other subcontractors for the purpose of receiving payments on fraudulent or doctored invoices, unbeknownst to the project owner. Cleverly, many of these fictitious entities were named after recognizable and legitimate subcontractors (or took on fictitious business names as such), so that VCC could issue invoices and charges from a recognized name, which the project owner would in turn assume came from the legitimate entity.  The project owner paid all such invoices and charges in full, and VCC consistently pocketed the inflated funds or split the funds by giving a kickback to the POCKET SUBCONTRACTORS as part of DEFENDANTS' elaborate scheme to defraud the project owner, both in doctoring fraudulent invoices and in creating fictitious entities to receive fraudulently procured funds.  Such conduct was perpetrated in part through acts of mail fraud, a means through which fraudulent invoices and charges were delivered.

29.     In exchange for the POCKET SUBCONTRACTORS' assistance in these schemes, VCC would knowingly promise future work and offer other kickback concessions to them and would otherwise compensate them financially. Plaintiff is informed and believes that VCC has employed and continues to employ these schemes in furtherance of their pursuit of private and public project awards under false pretenses.

1    Additionally, in order to further increase their profits, VCC would accept cash bribes

2    from subcontractors in exchange for awarding those subcontractors' bids, although

3    doing so was not in the project owner's best interest.

4    **C. DEFENDANTS' ADDITIONAL COSTS MANIPULATION SCHEMES**

5        30.    For the various construction projects, Plaintiff and VCC agreed to a "lump

6    sum" amount representing the total project fee which VCC established through its

7    subcontractor bids and vendor costs. In fraudulently inflating its subcontractor bids,

8    VCC was able to procure Plaintiff's agreement to grossly exorbitant lump sum prices

9    that were necessarily based on project costs that VCC misrepresented to Plaintiff.

10       31.    Moreover, on various projects, Plaintiff and VCC also expressly agreed to

11   certain cost allowances for each subcontractor trade's scope of work, which VCC also

12   could not exceed, such that Plaintiff was entitled to receive any funds remaining after

13   project completion as a credit due to cost underruns and other savings.

14       32.    Plaintiff is informed and believes that VCC further misrepresented the

15   actual project costs, by fraudulently submitting cost items that were not actually

16   incurred to Plaintiff in order to exhaust the allowances that should otherwise have inured

17   to Plaintiff's benefit. VCC did so by fraudulently representing to Plaintiff that the

18   various allowances had been expended when, in actuality, VCC had contracted with

19   various subcontractors – including the POCKET SUBCONTRACTORS - for lower

20   amounts that did not exceed the allowances.  In furtherance of this fraudulent scheme,

21   VCC would hard-bargain with some of the subcontractors to compel them to accept

22   even less for their completed work than they had initially contracted for, and represented

23   to Plaintiff that it was thereby entitled to a "Rebate" that was never actually paid.

33.   In order to conceal this fraud, VCC would fabricate the Bid Recap Sheets that it represented to Plaintiff reflected the accurate winning subcontractor bids for each project.  In fact, VCC would inflate these bids by upwards of twenty percent (20%) to exhaust the allowances, which inflation amounts VCC would ultimately retain for itself as pure profit.

34.   VCC even maintained internal "hidden cost" tabulations in order to keep track of exactly how much in allowances they had left so that it could exhaust the remainder by project completion.  VCC did so through the use of their own computer software that required VCC's subcontractors to electronically sign their subcontracts.  The actual physical contract that VCC maintained had an allowance attachment that was not apparent in the electronic version.  This addendum required the subcontractor to "carry" an extra amount above and beyond the total bid amount which would eventually be taken by VCC.  As such, VCC was able to feign to Plaintiff that the subcontracts actually reflected that the entire allowances had been used.

**D. DEFENDANTS' FRAUDULENT INSURANCE SCHEME**

35.   When a project owner and a general contractor begin a project together, they must determine how they intend to insure the project against liability.  One method is called a Contractor Controlled Insurance Program ("CCIP") where the project owner defers the task of obtaining insurance to the general contractor, and the general contractor includes the insurance premium as a line item charge on the final accounting of the project.  Often under this method, the contractor will require its subcontractors to obtain separate insurance policies for each individual job and cover the general contractor as an "additional insured."  Another method is called an Owner Controlled

Insurance Program ("OCIP") where the project owner takes on the responsibility of obtaining insurance for the project and pays the insurance premiums directly to the insurer.

### a.   Padding Costs on a Conventional CCIP

36.   Upon information and belief, part of DEFENDANTS' Fraudulent Insurance Scheme consisted of padding the insurance costs on CCIPs.  By industry standards, insurance premiums for large construction projects should be around 1-2% of the job cost.  Therefore, VCC would pay this 1-2% in insurance premiums, but doctor their final accounting ledgers to show a cost closer to 6.5%.  Because the insurance on this type of project would be contractor controlled, the project owner would only see this fraudulent final line item and pay it as part of the job cost.  In the end, VCC would pay the 1-2% premium to the insurer, receive the 6.5% from the project owner, and retain the difference as profit.  In order to keep the total costs to the owner within a seemingly reasonable range, VCC would engage their POCKET SUBCONTRACTORS – or force legitimately bidding subcontractors – to make concessions in their overall bid prices, to the detriment of Plaintiffs (and all legitimately bidding subcontractors), who were thereby unfairly competed against and at times chilled from bidding, as well as being deprived of the full contractual profit they should have realized; and to the detriment of the project owners, who Plaintiffs are informed and believe did not receive the benefit of such price concessions.

### b.   Concealing Insurance Credits in the Buyout Savings of a CCIP

37.   Plaintiff is informed and believes that VCC was also able to fraudulently charge excessive insurance premiums by knowingly concealing the actual costs of

insurance in the buyout savings line item of a project's ledgers.  Buyout savings come from standard, arms-length negotiations between a general contractor and a subcontractor to reduce the subcontractor's original bid down to a final contract cost. These buyout savings are due back to the project owner contingent on the contract cost not increasing throughout the course of the project, for example, by means of change orders.  Due to DEFENDANTS' aforementioned CHANGE ORDER SCHEME, VCC would fraudulently retain most, if not all, of these buyback savings, and ensure that the project owner would never receive the benefit of a decreased total project cost, though DEFENDANTS did.

38.   As noted above, normally under a CCIP when a subcontractor takes out an insurance policy for itself, it is also required to cover the general contractor as an "additional insured."  However, upon information and belief, VCC on certain projects commissioned their own insurance program, through a wholly owned offshore insurance company, and as to these projects would instruct their subcontractors not to purchase insurance for them and as such received a credit on the contract price in exchange, instead drawing upon their own offshore insurance company to self-insure the entire project.  In doing so, VCC lowered the insurance cost item substantially, without passing such savings on to the project owner or the engaged subcontractors who had already made price concessions.

39.   Instead of transparently displaying this insurance credit to the project owner, VCC would conceal the credit by muddying the cost-coding in their doctored accounting ledgers.  Then, VCC would exorbitantly charge the project owner upwards of 6.5% of the original contract bid, which was no longer even the actual bid, as it had

been substantially decreased due to the insurance credit and further negotiations with the subcontractor.  This procedure allowed VCC to bill and substantially profit from fraudulently charged insurance premiums, and in fact enabled VCC to overcharge Plaintiff by fraudulently increasing the insurance costs upwards of three times more than the original bid.

40.    Upon information and belief, VCC used this scheme to not only defraud project owners by passing on contrived insurance costs; Plaintiff is informed and believes that VCC routinely padded any actual insurance costs on projects with CCIPs, as opposed to OCIPs, in place, in furtherance of their insurance scheme to the detriment of project owners.

**E. DEFENDANTS' FRAUDULENT CHANGE ORDER SCHEME**

41.    VCC would also knowingly hire the same POCKET SUBCONTRACTORS for different portions of a project on both "lump sum" and "costs plus" payment structures.  Under a lump sum payment structure, all materials and labor costs are lumped into one predetermined, agreed upon, fixed fee.  Therefore, any subsequent increases in materials costs remain included under this fixed fee.  Due to the use of a fixed fee, there is no need for an audit of the materials and labor costs incurred for these jobs.  Under a costs plus payment structure, the owner of the project agrees to pay the ultimate cost of the materials, plus a negotiated rate for the labor costs. Unlike with a lump sum payment structure, a costs plus structure allows increases in materials costs to be added to the total fee.  Because of this, a project owner typically commissions an auditor to ensure that contractors do not overcharge for the labor or materials costs.

42.     In order to maximize their profits for each individual job, VCC would knowingly instruct their POCKET SUBCONTRACTORS to submit all change orders (i.e., orders reporting an increase in materials costs) for jobs that were under a costs plus payment structure although the reported materials were actually for a different lump sum job in which the same subcontractors were involved.  This fraudulent scheme allowed VCC to keep their materials costs as low as possible for the lump sum jobs while charging all of the additional material costs to the costs plus jobs, in order to maximize profits on each project, to the detriment of the project owner.

43.     In addition to profiting from this scheme alone, VCC not only instructed the POCKET SUBCONTRACTORS who were on multiple projects to fraudulently allocate their extra lump sum material costs to the costs plus projects; VCC would also knowingly instruct them to follow suit with the aforementioned POCKET SUBCONTRACTOR KICKBACK SCHEME and forge entirely fraudulent materials invoices to the unsuspecting project owner.  Therefore, as to certain costs plus projects, VCC would profit multiple times more than what was contractually agreed upon (i.e., one legitimate charge, one duplicate charge under the KICKBACK SCHEME, and one excessive charge under the CHANGE ORDER SCHEME).

44.     By way of example and upon information and belief, during the bidding process for a given project, VCC would instruct certain of its POCKET SUBCONTRACTORS to increase their respective bids by several hundred thousand dollars, which bids were submitted to Plaintiff, with VCC concealing the actual (substantially lower) bids.  Thereafter, a VCC sham company, such as DIVERSIFIED, would undercut the particular POCKET SUBCONTRACTOR's inflated bid by a small

amount, prompting VCC to nominally award DIVERSIFIED the bid.  VCC would then simply hire each POCKET SUBCONTRACTOR to perform the actual work for the amount of the POCKET SUBCONTRACTOR's original (i.e., concealed) bid, while charging Plaintiff the higher bid price, allowing VCC to retain the difference, all to Plaintiff's detriment.

## F. DEFENDANTS' COSTS PLUS TO LUMP SUM CONVERSION "REBATE" SCHEME

45.     Plaintiff is informed and believes that while construction was underway on certain projects, VCC would knowingly convince project owners to convert from an audited costs plus payment structure to an unaudited lump sum payment structure.  This way, VCC could fraudulently submit change orders and doctored invoices for as many extra materials as could seem possible under a costs plus structure, and then switch to a lump sum structure for the remainder of the job to make it more difficult for the project owners to detect the wrongdoing.

46.     Additionally, VCC knowingly used this CONVERSION SCHEME to justify sending fraudulent "deductive" change orders to subcontractors, requesting the subcontractors to reduce their final price as a "rebate" to the project owner, which "rebate" the project owner never realized, as VCC would still bill the full amount without notifying the project owner of the credit received, and retain the "rebate" for themselves as profit.

///

///

///

COMPLAINT

## FIRST CAUSE OF ACTION

## COUNT I – VIOLATION OF 18 U.S.C. § 1962(c)

### (Against ENTITY DEFENDANTS)

47.    Plaintiff refers to each of the foregoing paragraphs in their entirety, and hereby incorporates them by reference as though fully set forth herein.

48.    Plaintiff is informed and believes and thereon alleges that ENTITY DEFENDANTS acting in concert with the POCKET SUBCONTRACTORS are persons as defined by 18 U.S.C. § 1961(3) who collectively formed an associated-in-fact enterprise ("ASSOCIATION ENTERPRISE"). The ASSOCIATION ENTERPRISE is an illegally formed enterprise as defined in 18 U.S.C. § 1961(4), and was engaged in activities that affected, and continue to affect, interstate commerce.

49.    Upon information and belief, through the above-described conduct, these ENTITY DEFENDANTS agreed to and did participate in the conduct of the ASSOCIATION ENTERPRISE's affairs through a pattern of racketeering activity for the unlawful purpose of fraudulently obtaining monies and inflicting direct injury to Plaintiff through their anti-competitive conduct of self-dealing, bid rigging, and price fixing.

50.    Upon information and belief, over the span of many years, each individual and entity composing the ASSOCIATION ENTERPRISE contributed to the commission of the aforementioned related acts in furtherance of the ASSOCIATION ENTERPRISE's purpose of profiting from fraudulently obtained monies and proceeds that were derived from illegal activity.

COMPLAINT

51.     Furthermore, each individual and entity composing the ASSOCIATION ENTERPRISE conspired, confederated, and agreed with each other to violate 18 U.S.C. § 1962(c). Specifically, each individual and entity composing the ASSOCIATION ENTERPRISE conspired, colluded, and agreed with each other to commit the aforementioned conduct in furtherance of the ASSOCIATION ENTERPRISE through a pattern of racketeering activity, specifically mailing in falsified invoices to Plaintiff in order to illicitly obtain fraudulent monies.

52.     Plaintiff is informed and believes that ALLEY, DAVIS, KEENEY, MCCLENDON, and VCC orchestrated the ASSOCIATION ENTERPRISE as alleged above, and that ENTITY DEFENDANTS engaged in, and continue to engage in, the abovementioned schemes whereby ENTITY DEFENDANTS and their POCKET SUBCONTRACTORS, acting as an ASSOCIATION ENTERPRISE, committed the aforementioned tortious conduct through the commissioning of mail fraud, by directing the mailing of fraudulent invoices in order to elicit additional fraudulent profits from Plaintiff.

53.     As alleged above, VCC procured these funds by submitting and directing its POCKET SUBCONTRACTORS to submit fraudulent invoices to Plaintiff for "labor" and "materials" through the mail. ENTITY DEFENDANTS and their POCKET SUBCONTRACTORS conspired and colluded to make multiple such false and fraudulent communications by mail in furtherance of ENTITY DEFENDANTS' sundry schemes in order to defraud Plaintiff and sabotage Plaintiff's ability to benefit from a fair and competitive bidding process. Such conduct is defined by 18 U.S.C. § 1341 as mail fraud, which is defined by 18 U.S.C. § 1961 as a predicate act of racketeering.

54.     As alleged above, VCC used its power and standing in the marketplace to the detriment of Plaintiff. ENTITY DEFENDANTS engage in, and continue to engage in, the practice of conspiring and colluding with subcontractors in furtherance of ENTITY DEFENDANTS' aforementioned schemes, and otherwise procuring their participation by denying them the ability to freely participate in a competitive bidding process if they did not participate. Legitimate subcontractors were directly discouraged from bidding and ousted from projects as a result, leaving only POCKET SUBCONTRACTORS, who agreed to further and participate in the ASSOCIATION ENTERPRISE's scheme. This act and threat of extortion is defined as a racketeering activity by 18 U.S.C. § 1961(1) and the participation in this conduct by the members of the ASSOCIATION ENTERPRISE is a violation of 18 U.S.C. § 1962(c).

55.     Upon information and belief, ENTITY DEFENDANTS have directly and indirectly conducted and participated in the conduct of the ASSOCIATION ENTERPRISE's affairs through a pattern of racketeering activity and activity described throughout this Complaint, in violation of 18 U.S.C. § 1962(c).

56.     ENTITY DEFENDANTS' conduct involves US commerce because it implemented these illegal business practices on projects around the country. ENTITY DEFENDANTS' illegal and fraudulent conduct described throughout this Complaint has a direct, substantial, and reasonably foreseeable effect on interstate commerce that resulted in the injuries suffered by Plaintiff and gave rise to the RICO claims alleged herein.

57.     As a direct and proximate result of ENTITY DEFENDANTS' racketeering activities and violations of 18 U.S.C. § 1926(c), Plaintiff has been injured in its business

and property in that it has been deprived of millions, if not billions, of dollars which it would otherwise have retained had it not been for ENTITY DEFENDANTS' fraudulent conduct described herein. Such conduct was oppressive, fraudulent, and malicious, and subjected Plaintiff to cruel and unjust hardship in a willful and conscious disregard of its rights, warranting exemplary and punitive damages for the reasons set forth herein and for at least the following reasons:

   a. It was done with the purpose and intent of subjecting Plaintiff to the foreseeable risks of incurring substantial business losses from the fraudulent conduct described herein, including but not limited to overcharging Plaintiff on doctored invoices and Bid Recap Sheets, manipulating change orders, implementing the aforementioned misappropriation schemes, and employing the insurance overcharges, all to Plaintiff's detriment;

   b. It was done with the purposeful and intentional design of putting ENTITY DEFENDANTS' own pecuniary interests ahead of Plaintiff's rights and interests, at the expense of Plaintiff's rights to pursue its own livelihood and realize the fruits of its own professional endeavors;

   c. It was done with the purpose and intent of deceiving and fraudulently inducing Plaintiff into believing that the sundry project bids were legitimately being awarded to other legitimate subcontractors who offered more attractive bids, while ENTITY DEFENDANTS knew that the bids were predetermined to be awarded to their own POCKET SUBCONTRACTORS; and

d. It was done with the purpose and intent of converting, misappropriating and/or misdirecting Plaintiff in order to exercise dominion and control over the projects in furtherance of ENTITY DEFENDANTS' numerous fraudulent schemes, in a willful and conscious disregard of Plaintiff's rights to livelihood, legitimate and competitive bidding processes, and contracting practices, and all reasonably foreseeable damages and losses caused by the tortious conduct alleged herein.

58. Plaintiff is thus entitled to treble damages for the violations of RICO alleged herein pursuant to 18 U.S.C. § 1964(c).

## SECOND CAUSE OF ACTION

### COUNT II – VIOLATION OF 18 U.S.C. § 1962(d)

### (Against ENTITY DEFENDANTS)

59. Plaintiff refers to each of the foregoing paragraphs in their entirety, and hereby incorporates them by reference as fully set forth herein.

60. Plaintiff is informed and believes that ENTITY DEFENDANTS have intentionally conspired and agreed to directly and indirectly use or invest income that is derived from a pattern of racketeering activity in an interstate enterprise in violation of 18 U.S.C. § 1962(a). Specifically, ENTITY DEFENDANTS employed their fraudulent schemes on projects around the country thereby investing the income from the mail fraud in companies that are engaged in interstate commerce. Further ENTITY DEFENDANTS acquired or maintain interests in the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(b). Specifically, DEFENDANTS have maintained an interest in the ASSOCIATION ENTERPRISE by engaging in

extortion to perpetuate the POCKET SUBCONTRACTOR KICKBACK SCHEME. Lastly, DEFENDANTS conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). Specifically, DEFENDANTS and the POCKET SUBCONTRACTORS conducted and participated in the ASSOCIATED ENTERPRISE's affairs by conducting and participating in mail fraud and extortion. DEFENDANTS knew that their actions were part of the pattern of racketeering activity and agreed to the commission of those acts to further the schemes described throughout this Complaint. That conduct constitutes a conspiracy to violate U.S.C. § 1962(a), (b), and (c), in violation of 18 U.S.C. § 1962(d).

61.    As a direct and proximate result of ENTITY DEFENDANTS' conspiracies, the overt acts taken in furtherance of the conspiracies, and the violations of 18 U.S.C. § 1962(d), Plaintiff has been injured in its business and property and has been deprived of millions, if not billions, of dollars and of its ability to benefit from a competitive marketplace. Such conduct was oppressive, fraudulent, and malicious, and subjected Plaintiff to cruel and unjust hardship in a willful and conscious disregard of its rights, warranting exemplary and punitive damages for the reasons set forth herein and for at least the following reasons:

   a.    It was done with the purpose and intent of subjecting Plaintiffs to the foreseeable risks of incurring substantial business losses from the fraudulent conduct described herein, including but not limited to overcharging Plaintiff on doctored invoices and Bid Recap Sheets, manipulating change orders, implementing the aforementioned

misappropriation schemes, and employing the insurance overcharges, all to Plaintiff's detriment;

b.   It was done with the purposeful and intentional design of putting ENTITY DEFENDANTS' own pecuniary interests ahead of Plaintiff's rights and interests, at the expense of Plaintiff's rights to pursue its own livelihood, and realize the fruits of its own professional endeavors;

c.   It was done with the purpose and intent of deceiving and fraudulently inducing Plaintiff into believing that the sundry project bids were legitimately being awarded to other legitimate subcontractors who offered more attractive bids, while ENTITY DEFENDANTS knew that the bids were predetermined to be awarded to their own POCKET SUBCONTRACTORS; and

d.   It was done with the purpose and intent of converting, misappropriating and/or misdirecting Plaintiff in order to exercise dominion and control over the projects in furtherance of ENTITY DEFENDANTS' numerous fraudulent schemes, in a willful and conscious disregard of Plaintiff's rights to livelihood, legitimate and competitive bidding processes, and contracting practices, and all reasonably foreseeable damages and losses caused by the tortious conduct alleged herein.

62.   Plaintiff is entitled to treble damages for the violations of RICO alleged herein pursuant to 18 U.S.C. § 1964(c).

///

///

## **THIRD CAUSE OF ACTION**

## **VIOLATION OF 15 U.S.C. § 1**

### **(Against ENTITY DEFENDANTS)**

63.     Plaintiff refers to each of the foregoing paragraphs in their entirety, and hereby incorporates them by reference as fully set forth herein.

64.     ENTITY DEFENDANTS have knowingly and intentionally engaged in an unlawful contracting and have conspired to unlawfully and unreasonably restrain trade in violation of 15 U.S.C. § 1.

65.     The conspiracy consists of a continuing agreement, understanding, and concerted action between and among ENTITY DEFENDANTS and the POCKET SUBCONTRACTORS to further the POCKET SUBCONTRACTOR KICKBACK SCHEME wherein ENTITY DEFENDANTS promised monetary concessions, future work, and guaranteed contracts to subcontractors who agreed to participate in the scheme.

66.     Upon information and belief, ENTITY DEFENDANTS would form and hire their own sham entities as subcontractors on projects under the false pretense that they were separate and distinct entities when in actuality they were sham extensions of VCC. This anti-competitive conduct allowed ENTITY DEFENDANTS to realize excess profits on Plaintiff's projects, as ENTITY DEFENDANTS were engaging in self-dealing while representing to Plaintiff that they were engaging these entities through arms-length negotiations. These arrangements impose unreasonable restraints on trade and are Per Se unlawful under the Sherman Act.

67.     In addition to self-dealing with its own sham entities, VCC's actions of predetermining which subcontractor's bids would be accepted for work on projects and the POCKET SUBCONTRACTORS' agreement to pocket the monies realized from the POCKET SUBCONTRACTOR KICKBACK SCHEME constitute bid rigging arrangements that unreasonably restrain competition in the marketplace for an unlawful purpose, to wit, for ENTITY DEFENDANTS' own pecuniary gains at the expense of Plaintiff. ENTITY DEFENDANTS' agreements in this regard had a predictable and pernicious anticompetitive effect and served to stifle the free bidding processes that should have been in place for the aforementioned projects, and, as such, must be deemed Per Se unlawful under the Sherman Act.

68.     Such anti-competitive conduct directly and proximately caused harm to Plaintiff in the aforementioned projects, for at least the following reasons:

a.     Plaintiff was misled into believing that ENTITY DEFENDANTS were dealing with distinct and separately owned subcontractors and vendors with whom they engaged in arms-length transactions;

b.     ENTITY DEFENDANTS fraudulently induced Plaintiff into believing that particular trades were being retained at the lowest competitive bid;

c.     ENTITY DEFENDANTS' bid-rigging activity afforded them improper influence over the construction projects by preselecting POCKET SUBCONTRACTORS who were willing to assist in ENTITY DEFENDANTS' schemes to defraud Plaintiff;

d.     Directly and/or through their POCKET SUBCONTRACTORS, ENTITY DEFENDANTS manipulated various written documentation such as bid

books, bid recap sheets, change orders, invoices, subcontractor agreements, and accounting books all to Plaintiff's detriment; and

e.   ENTITY DEFENDANTS' self-dealing through their FRAUDULENT INSURANCE SCHEME caused Plaintiff to exorbitantly overpay for insurance premiums compared to competitive market rates.

69.   VCC and Plaintiff are vertical competitors and therefore do not compete directly with each other for projects. The sham companies and POCKET SUBCONTRACTORS are however horizontal direct business competitors with other legitimate contractors and therefore do compete directly with each other for projects. By virtue of the conduct set forth above, ENTITY DEFENDANTS controlled the bidding processes on the projects. ENTITY DEFENDANTS had predetermined and informed the POCKET SUBCONTRACTORS in advance that their bids would be selected for the projects. These POCKET SUBCONTRACTORS were chosen because they agreed to participate and further the POCKET SUBCONTRACTOR KICKBACK SCHEME, in addition to receiving ancillary benefits such as the promise of future work. This concerted bid-rigging scheme is an unreasonable restraint on trade and is Per Se unlawful under the Sherman Act.

70.   ENTITY DEFENDANTS' conduct involves US commerce and has a direct, substantial, and reasonably foreseeable effect on interstate commerce that resulted in the injuries suffered by Plaintiff, which give rise to the Plaintiff's antitrust claims alleged herein.

71.   As a direct and proximate result of ENTITY DEFENDANTS' conduct, agreements and the overt acts taken in violation of 15 U.S.C. § 1, Plaintiff has been

injured in its business and property.  Plaintiff has been deprived of millions, if not billions, or dollars and of the ability to derive benefits from a competitive marketplace. Such conduct was oppressive, fraudulent, and malicious, and subjected Plaintiff to cruel and unjust hardship in a willful and conscious disregard of its rights, warranting exemplary and punitive damages for the reasons set forth herein and for at least the following reasons:

      a.   It was done with the purpose and intent of subjecting Plaintiff to the foreseeable risks of incurring substantial business losses from the fraudulent conduct described herein, including but not limited to overcharging Plaintiff on doctored invoices and Bid Recap Sheets, manipulating change orders, implementing the aforementioned misappropriation schemes, and employing the insurance overcharges, all to Plaintiff's detriment;

      b.   It was done with the purposeful and intentional design of putting ENTITY DEFENDANTS' own pecuniary interests ahead of Plaintiff's rights and interests, at the expense of Plaintiff's rights to pursue its own livelihood and realize the fruits of its own professional endeavors;

      c.   It was done with the purpose and intent of deceiving and fraudulently inducing Plaintiff into believing that the sundry project bids were legitimately being awarded to arms-length contractors who offered more attractive bids, while ENTITY DEFENDANTS knew that the bids were predetermined to be awarded to their own POCKET SUBCONTRACTORS; and

d.    It was done with the purpose and intent of converting, misappropriating, and/or misdirecting Plaintiff in order to exercise dominion and control over the projects in furtherance of ENTITY DEFENDANTS' numerous fraudulent schemes, in a willful and conscious disregard of Plaintiff's rights to livelihood, legitimate and competitive bidding processes, and contracting practices and in further disregard of all reasonably foreseeable damages and losses caused by the tortious conduct alleged herein.

72.    Plaintiff is entitled to treble damages for the violations of RICO alleged herein pursuant to 18 U.S.C. § 1964(c).

## FOURTH CAUSE OF ACTION

## PROFESSIONAL NEGLIGENCE

### (Against VCC)

73.    Plaintiff refers to each of the foregoing paragraphs in their entirety, and hereby incorporates them by reference as though fully set forth herein.

74.    VCC owed a professional duty of care to Plaintiff to use the reasonable care, skill, and diligence as reasonably prudent individuals and/or entities of similar occupation, knowledge, and experience, including the taking of appropriate measures to do at least the following:

a.    To conduct themselves and carry out their professional services in a manner consistent with the level of competence, skill, and diligence normally imposed upon professionals in the construction industry with the same knowledge and experience;

-33-

COMPLAINT

b. To conduct the necessary investigations and make the requisite inquiries to determine the accuracy of the representations made by them in each of the aforementioned schemes, through which they profited millions, if not billions, of dollars;

c. To have diligently investigated all of the documentation and confirmed the veracity and completeness of the records provided by them in connection with their bidding processes and project accounting; and

d. To ensure that they, nor anyone within their organization, did not engage in any transactions that had an effect of costing Plaintiff and subcontractors more than was actually expended, and to accurately report the nature and extent of change orders that were implemented to Plaintiff.

75. At all relevant times mentioned herein, VCC, failed to exercise reasonable care, skill, and diligence over numerous private projects in breaching each of the aforementioned duties, including by failing to conduct the necessary investigations to confirm the authenticity of the verbal and written representations made by them.

76. As a direct and proximate result of the said VCC's conduct, Plaintiff has suffered damages, loss, and harm in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION

### NEGLIGENCE

### (Against All DEFENDANTS)

77. Plaintiff refers to each of the foregoing paragraphs in their entirety, and hereby incorporates them by reference as though fully set forth herein.

78.     DEFENDANTS owed a duty of care to Plaintiff to use reasonable care and diligence in their dealings with Plaintiff, including to take appropriate measures to do at least the following:

a.     To conduct themselves and carry out their services in a reasonable manner;

b.     To conduct the necessary investigations and make the requisite inquiries to determine the accuracy of the representations made by them in each of the aforementioned schemes, through which they profited millions, if not billions, of dollars;

c.     To have diligently investigated all of the documentation and confirmed the veracity and completeness of the records provided by them in connection with their bidding processes and project accounting; and

d.     To ensure that they, nor anyone within their organization, did not engage in any transactions that had an effect of costing Plaintiff and subcontractors more than was actually expended, and to accurately report the nature and extent of change orders that were implemented to Plaintiff.

79.     At all relevant times mentioned herein, DEFENDANTS failed to exercise reasonable care and diligence over numerous private projects in breaching each of the aforementioned duties, including by failing to conduct the necessary investigations to confirm the authenticity of the verbal and written representations made by them.

80.     Moreover, as to each of the INDIVIDUAL DEFENDANTS, Plaintiff is informed and believes that each engaged in the aforementioned conduct for his own personal benefit and advantage, rather than solely on behalf of and at the direction of

-35-

COMPLAINT

ENTITY DEFENDANTS. As such, Plaintiff is informed and believes that each of the INDIVIDUAL DEFENDANTS attempted to gain personally from his own active direction and participation in DEFENDANTS' various fraudulent schemes, and placed his own pecuniary interests above those of ENTITY DEFENDANTS in order to personally profit therefrom.

81.     As a direct and proximate result of DEFENDANTS' conduct, Plaintiff has suffered damages, loss, and harm in an amount to be proven at trial.

<u>**SIXTH CAUSE OF ACTION**</u>

**INTENTIONAL MISREPRESENTATION**

**(Against INDIVIDUAL DEFENDANTS)**

82.     Plaintiff refers to each of the foregoing paragraphs in their entirety, and hereby incorporates them by reference as though fully set forth herein.

83.     Throughout the various construction projects that ENTITY DEFENDANTS contracted with Plaintiff to build, INDIVIDUAL DEFENDANTS made numerous false representations, oral and in writing, to Plaintiff regarding the legitimacy of ENTITY DEFENDANTS' conduct and business practices.

84.     In this regard, the following false representations were knowingly made to Plaintiff:

      a.     That a fair and competitive bidding process occurred for the selection of the subcontractors on each project;

      b.     That the subcontractors selected from said bidding process had submitted the lowest bids based on arms-length transactions;

c.   That no bids were concealed from Plaintiff and that the Bid Recap Sheets accurately reflected the actual bidding processes;

d.   That the subcontractors who were awarded bids were separately owned and operated entities that actually performed the work for which they were selected;

e.   That the bid books accurately reflected the actual bids that were submitted without any doctoring;

f.   That the "labor" and "material" invoices submitted to Plaintiff accurately reflected the actual costs for each project and were not inflated;

g.   That each line item on the final accounting ledgers were accurate and were not inflated;

h.   That all change orders were legitimate, reflected actual work that was directed and performed, and were otherwise accurate in depicting the nature and scope of work on each respective job; and

i.   That all deductive change orders and rebates were properly passed on and inured to the benefit of Plaintiff.

85.   However, INDIVIDUAL DEFENDANTS, and each of them, knew these representations were false for at least the following reasons:

86.   INDIVIDUAL DEFENDANTS caused and/or directed the predetermination of the various subcontractors (i.e., the POCKET SUBCONTRACTORS) who would be awarded the various project bids;

a.   INDIVIDUAL DEFENDANTS caused the concealment of the lowest legitimate bids from Plaintiff through mechanisms like doctored Bid

Recap Sheets, instead causing and/or directing the selection of higher bids from ENTITY DEFENDANTS' POCKET SUBCONTRACTORS and/or sham entities;

b. INDIVIDUAL DEFENDANTS caused project jobs to be awarded to ENTITY DEFENDANTS' own sham entities, which were created for the purpose of defrauding Plaintiff;

c. INDIVIDUAL DEFENDANTS actively instructed their subordinates to doctor bid books in order to dupe Plaintiff into adopting their fraudulent project cost calculations;

d. INDIVIDUAL DEFENDANTS caused and/or directed the submission of labor invoices to Plaintiff, which they knew actually contained both labor and material costs, and billed Plaintiff separately for materials, pocketing the difference;

e. INDIVIDUAL DEFENDANTS caused and/or directed the procurement of fraudulent invoices from the POCKET SUBCONTRACTORS or ENTITY DEFENDANTS' own fictitious entities and billed Plaintiff for the entirety of said invoices;

f. INDIVIDUAL DEFENDANTS caused and/or directed the excessive charging of inflated insurance premiums from ENTITY DEFENDANTS' own offshore insurance company;

g. INDIVIDUAL DEFENDANTS caused and/or directed the submission of fraudulent change orders to Plaintiff that included costs incurred from separate projects; and

h.   INDIVIDUAL DEFENDANTS fraudulently retained the profits derived from deductive change orders and rebate savings rather than passing such savings on to Plaintiff.

87.   The INDIVIDUAL DEFENDANTS intended that Plaintiff rely on their representations in order to induce Plaintiff to drastically overpay on the costs of each project.

88.   Plaintiff, at the time the INDIVIDUAL DEFENDANTS, and each of them, made these representations, was ignorant of the falsity of the representations and believed them to be true.  Plaintiff had no cause or reason to believe the representations were false, because they had no mechanism to audit DEFENDANTS' cost manipulation schemes; could not gain access to DEFENDANTS' fraudulent cost-coding and bid book doctoring; and certainly could not have any way of knowing of DEFENDANTS' fraudulent change order schemes and bid concealments.  Moreover, Plaintiff rightfully reposed trust in INDIVIDUAL DEFENDANTS, with whom Plaintiff's principals had a continuing and recurring business relationship, which encompassed numerous multi-million dollar projects.

89.   Moreover, Plaintiff reasonably relied on the INDIVIDUAL DEFENDANTS' representations because the INDIVIDUAL DEFENDANTS held themselves out as legitimate construction professionals with national clientele and billions of dollars of conglomerate development and construction projects among their accolades, which Plaintiff had every reason to believe were legitimately achieved and scrupulously earned.

COMPLAINT

90. As a result of the INDIVIDUAL DEFENDANTS' misrepresentations, Plaintiff has been and will continue to be damaged from its fraudulently incurred construction costs and ENTITY DEFENDANTS' aforementioned schemes, in an amount to be proven at trial.

91. Plaintiff's reliance on INDIVIDUAL DEFENDANTS' aforementioned misrepresentations was a substantial factor in causing its harm because Plaintiff would not have overpaid for the fraudulent construction costs – nor even have hired VCC to build its various projects - had Plaintiff known of the aforementioned schemes and INDIVIDUAL DEFENDANTS' fraudulent misrepresentations.

92. The aforementioned conduct was oppressive, fraudulent, deceitful, and malicious and subjected Plaintiff to cruel and unjust hardship in a willful and conscious disregard of its rights, warranting exemplary and punitive damages pursuant to 42 U.S.C. § 1938 for the reasons set forth herein and for at least the following reasons:

    a. It was done with the purpose and intent of subjecting Plaintiff to the foreseeable risks of grossly overpaying construction costs under false pretenses, inuring to the benefit of the INDIVIDUAL DEFENDANTS;

    b. It was done with the purposeful and intentional design of putting the INDIVIDUAL DEFENDANTS' own personal interests ahead of Plaintiff's rights and interests at the expense of Plaintiff's rights to pursue its own livelihood and realize the fruits of its real estate endeavors;

    c. It was done with the purpose and intent of deceiving and fraudulently inducing Plaintiff into believing that all costs and charges it paid to ENTITY DEFENDANTS were legitimate; and

COMPLAINT

d.   It was done with the purpose and intent of converting, misappropriating, and/or misdirecting Plaintiff's profits in furtherance of DEFENDANTS' aforementioned schemes in a willful and conscious disregard of Plaintiff's livelihood and all reasonably foreseeable damages proximately resulting therefrom.

## PRAYER FOR RELIEF

93.   WHEREFORE, Plaintiff prays for judgment against all DEFENDANTS and DOES 1-100, and each of them as follows:

## ON THE FIRST, SECOND, THIRD, AND SIXTH CAUSES OF ACTION

1.  For an award of compensatory, treble, and punitive damages, as well as pre-judgment and post-judgment interest, in an amount to be determined at trial;

2.  For an award of the costs, expenses, and attorney's fees incurred in prosecuting this action; and

3.  For any other such relief the Court deems proper.

## ON THE FOURTH AND FIFTH CAUSES OF ACTION

1.  For an award of compensatory damages, as well as pre-judgment and post-judgment interest, in an amount to be determined at trial; and

2.  For any other such relief the Court deems proper.

DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all of the claims herein.

///

///

1

Respectfully Submitted

Dated: August 13, 2018
2
WILSON KEADJIAN BROWNDORF LLP

3
By: _____

4
Marc Y. Lazo

5
Attorneys for the Plaintiff
Thomas Land & Development, LLC

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

COMPLAINT